**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ALLEN FITZGERALD CALTON,** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 4:07-CV-471-Y** |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND NOTICE AND ORDER**

This cause of action was referred to the United States Magistrate Judge pursuant to the

provisions of 28 U.S.C. § 636(b), as implemented by an order of the United States District Court for

the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United

States Magistrate Judge are as follows:

## I. FINDINGS AND CONCLUSIONS

### A. NATURE OF THE CASE

This is a petition for writ of habeas corpus by a state prisoner under 28 U.S.C. § 2254.

### B. PARTIES

Petitioner Allen Fitzgerald Calton, TDCJ-ID #1123880, is a state prisoner in custody of the

Texas Department of Criminal Justice, Correctional Institutions Division, in Abilene, Texas.

Respondent Nathaniel Quarterman is the Director of the Texas Department of Criminal

Justice, Correctional Institutions Division.

## C. Factual and Procedural History

In 2002 Calton, a habitual offender, was charged by indictment with attempted murder in Case No. 0843168D in the 213th District Court of Tarrant County, Texas. *Ex parte Calton*, State Habeas Application No. WR-65,590-07, vol. 4, at 816. In 2004, a jury found him guilty of the offense and assessed his punishment at life imprisonment. *Id.* at 818. He appealed his conviction, but the Second District Court of Appeals of Texas affirmed the trial court's judgment. *Calton v. Texas*, No. 2-04-228-CR, slip op. (Tex. App.–Fort Worth Nov. 17, 2005) (not designated for publication). Calton filed a petition for discretionary review in the Texas Court of Criminal Appeals but subsequently withdrew the petition. *Calton v. Texas*, PDR No. 0036-06. Thereafter, Calton filed numerous postconviction state habeas applications challenging his conviction and/or sentence to no avail. *Ex parte Calton*, State Habeas Application Nos. WR-65,590-07 thru WR-65,590-13. He filed this federal petition for writ of habeas corpus on August 8, 2007. *Spotville v. Cain*, 149 F.3d 374, 377 (5th Cir. 1998) (holding pro se habeas petition filed when papers delivered to prison authorities for mailing).

The facts of the case as set forth by the Second District Court of Appeals are as follows:

> On the night of April 23, 2002, Fitzgerald Calton drove to Everett Angle's home to speak with him. When Calton pulled up to Angle's house, Craig Tate who was working outside, went inside and told Angle that Calton was outside waiting for him. Angle walked outside to Calton's car and had what appeared to be a friendly discussion with Calton. During their conversation, Angle looked back at Tate and asked him to put away the lawn mowers. At that time, Calton got out of his car, approached Angle, and shot him in the face. When Angle fell to the ground, Calton stood over him and shot him again. The second shot glanced off Angle's skull. Calton fired at Angle's head a third time and then got back into his car and drove away.
>
> Later that night, Calton engaged in a lengthy high-speed chase with police officers. The chase culminated with Calton driving his car into White Rock Lake. Calton represented himself at trial....

*Calton*, No. 2-04-228-CR, slip copy, at 2. Calton's defensive theory was that he acted in self-defense or in a semiconscious state, thereby negating the element of intent.

D. ISSUES

Calton raises fourteen grounds for habeas relief:

(1) His waiver of counsel was involuntary due to coercion, duress, and mistreatment (ground one);

(2) His conviction was obtained by the state's use of perjured testimony (ground two);

(3) The state withheld exculpatory evidence (ground three);

(4) The presumption of innocence was tainted by the state's revelation that he was incarcerated at the time of trial (ground four);

(5) Newly discovered evidence explains his bizarre behavior and semiconscious state at the time of the offense (ground five);

(6) He was denied due process at trial because fear was imposed upon him by his physical restraint with a 50,000 volt stun belt (ground six);

(7) He received ineffective assistance of trial and appellate counsel (ground seven);

(8) He was denied access to the courts (ground eight);

(9) He is actually innocent of the offense (ground nine);

(10) His conviction was obtained by the state's use of perjured, false or misleading testimony (ground ten);

(11) Due to cumulative error, he was denied a fair trial (ground fourteen); and

(12) The trial court erred by admitting evidence that was inadmissible and unduly prejudicial and inflammatory, by denying admission of crucial evidence by the defense, and by making a key defense witness testify in prison garb, handcuffed and shackled (grounds eleven, twelve and thirteen). (Petition at 7-89)

E.  RULE 5 STATEMENT

Calton has waived and moved to strike grounds ten and twelve on exhaustion grounds. (docket entries 54 & 55)  Quarterman believes that Calton has sufficiently exhausted his state remedies as to the remaining issues as required by § 2254(b)(1).

F.  DISCUSSION

## 1.  *Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case.  *Williams*, 529 U.S. at 407-08.

Further, federal courts give great deference to a state court's factual findings.  *Hill*, 210 F.3d at 485.  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  The applicant has the burden of rebutting the presumption of

correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Typically, when the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written order, as the court did here, it is an adjudication on the merits, which is entitled to this presumption. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

## 2. *Waiver of Counsel*

Calton claims he waived his right to counsel at trial due to mistreatment, duress, and counsel's "griping" about payment for his representation. (Petition at 7, 10-15) On May 9, 2002, Leon Haley was appointed to represent Calton in the underlying criminal case and another criminal case in Case No. 0842912 also pending in the trial court. (Clerk's R., vol. 1, at 24) During the trial in Case No. 0842912, Haley admitted to "griping" to Calton about the fact that Calton had other attorneys that were retained to represent him in that and/or other pending criminal matters. On April 22, 2003, Calton moved to dismiss Haley on the basis of alleged ineffective assistance and asserted his right to self-representation. (*Id.* at 68) On May 9, 2003, Calton waived his right to counsel in open court and in writing. (*Id.* at 91)

Calton's claim was rejected on direct appeal and state habeas review. The appellate court analyzed the issue as follows:

> The Sixth and Fourteenth Amendments guarantee that a person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he can be validly convicted and punished for any felony. *Faretta v. California*, 422 U.S. 806, 807-08 (1975) Those amendments also guarantee that any such defendant may dispense with counsel and make his own defense. *Id.* at 818-20. Such a decision, to be constitutionally effective, must be made (1) competently, (2) knowingly and intelligently, and (3) voluntarily. *Godinez v. Moran*, 509 U.S. 389, 400-01 (1993); *Faretta*, 422 U.S. at 834-36; *see also* TEX. CODE CRIM. PROC. ANN. art. 1.051 (Vernon 2005). The decision to waive counsel and proceed *pro se* is made "knowingly and intelligently" if it is made with a full understanding of the right to

counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation. *Faretta*, 509 U.S. at 834-36. The decision is made "voluntarily" if it is uncoerced. *Godinez*, 509 U.S. at 401 n.12.

The record must reflect that the trial court thoroughly admonished the defendant. *Faretta*, 442 U.S. at 834-36; *Blankenship v. State*, 673 S.W.2d 578, 583 (Tex. Crim. App. 1984). Admonishments of a defendant who wishes to proceed *pro se* should include an effort to ensure that the defendant is aware of the practical disadvantages of representing himself. *Johnson v. State*, 760 S.W.2d 277, 279 (Tex. Crim. App. 1988). *Faretta* does not mandate an "inquiry concerning appellant's age, education, background, or previous mental health history" in every instance where an accused expresses a desire to represent himself, for the record may otherwise be sufficient for the court to make an "assessment of his knowing exercise of the right to defendant himself." *Faretta*, 422 U.S. at 836; *Martin v. State*, 630 S.W.2d 952, 954 (Tex. Crim. App. 1982). But the defendant should be aware that there are technical rules of evidence and procedure, and that he will not be granted any special consideration solely because he has asserted his *pro se* rights. *Faretta*, 422 U.S. at 836. As *Faretta* held, a defendant's eyes should be open to the fact that while it is undoubtedly his right, he is about to embark on a risky course. *Id.*

In this case, the record reflects that twice during a pretrial proceeding, the trial court explained to Calton that because of his indigence, he had the right to have counsel appointed to represent him. Further, the trial court told Calton that his cases looked to be "rather serious," that he would be expected to follow the rules, and that there were disadvantages to representing himself. The trial court also asked Calton if he had a law degree or a law license. When Calton responded that he did not, the trial court informed him that the laws were complicated and that Calton "may get [himself] in a bind."

Calton assured the trial court that he was aware that his cases were serious and that he understood that counsel would be provided for him if he was indigent. He also stated that he was familiar with the Texas Rules of Evidence and the Texas Code of Criminal Procedure. Calton stated further that he knew that he could get himself in a "bind" by representing himself, but that he was willing to take the risk. And three times during the proceeding, Calton stated that he wished to discharge his appointed attorneys.

Viewing the record in its entirety, we hold that Calton competently, knowingly, intelligently, and voluntarily exercised his right to defend himself, and in that [sic] doing so, he relinquished the benefits of representation by counsel.

*Calton v. Texas*, No. 2-04-228-CR, slip copy at 3-4.

Similarly, after conducting a hearing by affidavit, the state habeas judge, who also presided over Calton's trial, entered the following relevant findings of fact regarding the issue:

38. In his "Waiver of Right to Counsel," Applicant acknowledged knowing that

he would be appointed a lawyer free of charge if he were unable to employ a lawyer.

39.     Hon. Haley recalls that Applicant complained to him that since he was being paid by the county that Hon. Haley was biased against Applicant and for the State.

40.     Hon. Haley did not tell Applicant, nor imply, that he was not getting paid to represent Applicant.

41.     Hon. Haley never told Applicant, nor implied to him, that he wanted to be paid by Applicant or Applicant's family members.

42.     Hon. Haley never told Applicant, nor implied to him, that he would render poor representation.

43.     Hon. Haley never told Applicant, nor implied to him, that he would not subpoena witnesses on Applicant's behalf.

44.     Hon. Haley never told Applicant, nor implied to him, that he would not put on an adequate defense if Applicant did not pay him.

45.     Applicant never requested alternate court-appointed counsel in lieu of representing himself.

46.     Applicant presents no credible evidence to support his claim that Hon. Haley coerced him to represent himself.

47.     Applicant presents no credible evidence to support his claim that he waived his right to counsel because he thought Hon. Haley was representing him for free.

48.     Applicant presents no credible evidence to support his claim that Hon. Haley mistreated him.

49.     Applicant knew that Hon. Haley was not representing him for free.

50.     Applicant presents no credible evidence to support his claim that his waiver of counsel was involuntary.

51.     Applicant knowingly, intelligently and voluntarily waived his right to counsel.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, vol. 3, at 546 & vol. 4, at 682, 789-

90 (citations to the record omitted).

Based on its findings, the state habeas court concluded that Calton had failed to prove Haley coerced, mistreated or forced him into waiving his right to counsel or that his waiver was involuntary. (Supplemental Reporter's R. 4-17) *Id.* at 803-04. Weighing the credibility of the affiant(s) was the role of the state habeas court, and, clearly, the state court found the affidavit of counsel to be credible. *See Pippin v. Dretke*, 434 F.3d 782, 792 (5ᵗʰ Cir. 2005), *cert. denied*, 127 S. Ct. 351 (2006) (providing that a trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are "virtually unreviewable" by the federal courts). The fact that Haley, in an unrelated criminal trial, admitted to "griping" to Calton because Calton had other retained counsel does not rise to the level of mistreatment or coercion. Furthermore, in the instant case, both of Calton's counsel were court-appointed.

### 3. Perjured Testimony

Calton claims the state, over his objection, was permitted to introduce and use perjured testimony by the victim Everett Angle. (Petition at 7, 15-18) During cross-examination, Calton asked Angle if there was any reason Calton would have to shoot him. (Reporter's R., vol. 3, at 37) Angle responded that he "didn't think [Calton] did." (*Id.* at 38) On redirect, the trial court allowed the state to question Angle about a discussion Angle had with a police detective the day before the shooting, during which Angle implicated Calton in the murder of Billy Hanks. (*Id.* at 65-77) Angle told several neighbors about his conversation with the detective. The testimony was admitted as proof of Calton's motive for shooting Angle. *See* TEX. R. EVID. 404(b).

The state habeas judge entered the following relevant findings of fact regarding the issue:

52.    Applicant presents evidence of conflicting statements from the victim given at the time the victim was shot in the head and given at trial.

53.    During cross-examination of Mr. Angle, Applicant established that Detective Boetcher actually visited Mr. Angle on two separate occasions after the shooting of Billy Hanks.

54.    During cross-examination, Angle contradicted the testimony that he gave on direct examination, stating in effect that on neither occasion when visited by Boetcher did he name Applicant in connection with the Billy Hanks murder.

55.    Angle's testimony on cross-examination was consistent with his testimony at the bond hearing on May 1, 2002.

56.    Detective Thomas Boetcher also testified that he visited Mr. Angle at his home on two separate occasions.

57.    Detective Boetcher also testified that he and Angle discussed the fact that Applicant's name came up in conversation related to the Billy Hanks murder.

58.    Applicant cross-examined Boetcher on the facts of the two visits he made to Angle's residence and what transpired during those two visits.

59.    Since both versions of the testimony were presented to the jury, the jury was able to resolve any factual discrepancy.

60.    Applicant presents no credible evidence that the State of Texas suppressed the fact that Mr. Angle gave contrary testimony on a prior occasion. Applicant was present when the prior testimony was given by Mr. Angle.

61.    Applicant presents no credible evidence that the victim's testimony was perjurious or false.

62.    Applicant presents no credible evidence that the State knowingly used perjured testimony.

63.    Applicant presents no credible evidence that the State knowingly argued perjured testimony.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, at 790-91 (citations to the record omitted).

Based on its findings, the state habeas court concluded Calton had failed to prove that the

victim's testimony was false, that the state presented testimony that a member of the prosecution team knew to be false, that the state argued perjured testimony, or that his right to due process was violated. *Id.* at 804. Calton's assertion that the victim's testimony was false involves alleged inconsistencies or contradictions in witness testimony, which, as noted by the state court, are matters for the factfinder to resolve. *See Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988); *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982)

**4. *Brady* Claim**

Calton claims the state withheld the victim's medical records from Medstar ambulance service, which contained information he could have been used to impeach Angle, until late in the trial and after he had already cross-examined Angle. (Petition at 7, 19-28)

The state habeas judge entered the following relevant findings of fact regarding the issue:

64.     Applicant presents no credible evidence that he could not have subpoenaed the victim's medical records.

65      Applicant presents no credible evidence that he did not have access to the victim's medical records.

66.     Applicant, in fact, had access to the victim's medical records. Applicant stated during his cross-examination of the victim that "I took a look at your medical records–."

67.     During trial Applicant stated that he had Angle's medical records in front of him.

68.     During the direct examination of defense witness Joe Snow, the MedStar paramedic that treated the victim, Applicant showed Snow a copy of his chart.

69.     During the direct examination of Snow, Applicant was able to effectively use the victim's medical records to present Snow's testimony.

70.     Applicant presents no credible evidence that he was unable to use the victim's medical records at trial.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, at 791-92 (citations to the record omitted).

Based on its findings, the state habeas court, noting that the state was not obligated to produce material that is in the public domain, otherwise available to the defendant, or of which the defendant already had knowledge, concluded that Calton had failed to prove the medical records were not available to him, that he was not aware of the medical records, that the state failed to disclose evidence, that there was a reasonable probability that the outcome of his trial would have been different had he had the victim's medical records sooner, or that he was denied due process. *Id.* at 805. The court determined Calton was, in fact, aware of and had possession of the victim's medical records during trial and was, in fact, able to use the records during the trial. *Id.* There is no *Brady* violation if the defendant, using reasonable diligence, could have obtained the information. *See McBride v. Johnson*, 122 F.3d 1067, 1997 WL 464545, at *10 (5th Cir. July 29, 1997) (not designated for publication in the Federal Reporter).

### 5. *Prosecutorial Misconduct and Trial Court Error*

Calton claims his presumption of innocence was tainted and breached as a result of prosecutorial misconduct when the prosecutor was allowed to elicit testimony from a defense witness, Calton's cellmate in the Tarrant County jail–who was dressed in prison clothes, handcuffed and shackled, revealing Calton's "incarceration status"–at the time of trial and the fact that Calton had daily contact with the witness in the same tank. (Petition at 7, 28-32) Calton proposes that the right of a criminal defendant to appear before the jury in nonprison attire and without shackles should extend to a defense witness. (*Id.* at 84-87)

The state habeas court entered the following findings of fact regarding the issue:

74.     Applicant presents no credible evidence to support his claim that evidence that Applicant was incarcerated tainted and breached the presumption of innocence.

75.     Applicant presents no credible evidence to support his claim that the jury was biased by evidence that Applicant was incarcerated.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, at 792 (citations to the record omitted).

Based on its findings, the state habeas court concluded that Calton had failed to prove that the state's question was improper, that the indication that he was incarcerated contributed to his conviction or punishment, or that the presumption of innocence was tainted and breached. *Id.* at 805. Only sheer speculation supports Calton's theory that he was deprived of a fair trial because of his witness's appearance in prison uniform and restraints and his witness's association with Calton in jail. Speculation does not rebut the presumption of correctness. *See Lincecum v. Collins*, 958 F.2d 1271, 1279-80 (5th Cir. 1992). Further, even if the trial judge erred in admitting the testimony, Calton has not carried his burden of proving the mistake was crucial, critical, and highly significant and that his trial was rendered fundamentally unfair by the court's admission, particularly in light of the weight of the other evidence introduced at trial of his guilt.

## 6. *Newly Discovered evidence and Actual Innocence*

Calton claims that newly discovered evidence, in the form of his medical records, show he is actually innocent because the records prove he formed no intent to shoot Angle but, instead, was in a hypoglycemic state–i.e., a semiconscious state, and/or insane at the time of the offense as a result of his accidental ingestion of an unknown chemical on April 8, 2002 (involuntary intoxication). (Petition at 32-37, 64-71) He concedes that he received his medical records late in the trial but asserts that he was unable to put them to effective use because the first defense expert

12

had already testified and left town and because he had already waived an insanity defense. (*Id.* at 36)

> The state habeas court entered the following relevant findings of fact regarding the issue:

> 74. Applicant's own medical records from the time of the incident are not newly discovered evidence because Applicant was aware of his own medical records at the time of trial.

> 75. Even if Applicant's medical records contain the information that Applicant claims, they are mere duplication of other testimony and evidence presented by Applicant during the trial.

> 76. Applicant presents no credible evidence that there is newly discovered evidence that establishes his innocence.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, at 792-93.

Based on its findings, and applying the standard set forth in *Herrera v. Collins*, 506 U.S. 390 (1993), the state habeas court concluded that Calton's own medical records are not newly discovered evidence because he knew about the records at the time of trial and the records failed to prove his innocence. *Ex parte Calton*, State Habeas Application No. WR-65,590-07, at 806. Federal habeas relief is available to a state prisoner only if the prisoner has been deprived of some right secured to him by the federal constitution or law of the United States. *See Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Claims of actual innocence based on new evidence relevant to the guilt of a state prisoner are not cognizable on federal habeas corpus absent an independent constitutional violation occurring in the underlying state trial. *See Herrera,* 506 U.S. at 400; *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000); *Jacobs v. Scott,* 31 F.3d 1319, 1324 (5th Cir. 1994). Calton's claims fail to implicate a federal constitutional violation. Thus, his actual innocence claims are not cognizable for federal habeas review.

## 7. *Stun Belt*

Calton claims his right to due process was denied at trial because fear was imposed on him as a result of being physically restrained with a 50,000-volt stun belt. (Petition at 37-48)

The state habeas court entered the following relevant findings of fact regarding the issue:

150.    Applicant presents no credible evidence to support his claim that the stun belt caused him fear, distracted him, caused him to lose track, or that it caused him to fail to object or to fail to argue with the trial court.

151.    Applicant presents no credible evidence that the use of the stun belt was improper.

152.    A stun belt was placed on Applicant due to his size and strength, and for the safety of the court staff, witnesses and persons in the courtroom.

153.    Applicant was fully competent to represent himself at all times the stun belt was in place. Applicant was not impaired in his ability to participate in his trial by use of the stun belt.

154.    There was no difference in Applicant's ability to represent himself with the stun belt on compared to his representation with the stun belt off.

155.    Applicant appropriately objected, preserved error and cross-examined witnesses while the stun belt was in place. Applicant was able to represent himself with a great deal of skill during the entire trial.

156.    Before using the stun belt, the trial court carefully considered all less restrictive alternatives. None of the less restrictive alternatives were appropriate or feasible to Applicant's unique situation.

157.    Of paramount consideration to the trial court in deciding which security device to employ was the fact that Applicant would be representing himself. During trial it was necessary to allow Applicant to move around in the courtroom to conduct voir dire, deliver an opening statement, and to deliver closing arguments. The trial court also had to plan for the eventuality of Applicant testifying before the jury during the trial; thus needing to move back and forth to the witness stand. The trial judge was aware of the necessity to allow the *pro se* Applicant the same ability to move around the courtroom as the prosecutors were allowed so that it did not appear that one side or the other had an advantage and to preserve Applicant's presumption of innocence. Restraints other than the stun belt, such as shackles, would

have been visible to the jury at these times.

158. No part of the stun belt equipment was visible to the jury.

159. Before employing the stun belt, the trial court took into consideration the criteria for triggering the belt, the training of the deputies who would be monitoring the stun belt, and the possibility of accidental discharge. The trial court was assured that the deputies were well-trained, that objective criteria were in place for the discharge of the stun belt, and that there was a very low chance of an accidental discharge. Taking all of the factors presented into consideration, the trial court believed that an essential State interest was served by the use of the stun belt.

160. The stun belt was not used on Applicant for the entire trial. The stun belt was permanently removed from Applicant during the state's case in chief at the guilt/innocence phase of the trial. The sun belt was not used on Applicant during the pretrial hearings in this case or during the pretrial hearings on his other cases.

161. During the limited time it was used, the stun belt was removed from Applicant during all court breaks. The trial court discontinued use of the stun belt because it was overly time consuming to take the stun belt on and off Applicant during those breaks due to all of the safety factors that were used in the operation of the stun belt. After the removal of the stun belt, the trial court had to resort to the use of shackles. Due to the cumbersome process of installing the stun belt, shackling was the next best alternative. Using only shackles on Applicant presented a great risk, but the risk had to be tolerated under the unique situation of the trial.

162. At no time were the shackles visible to the jury.

163. At no time during its use was the stun belt activated.

164. Another important consideration in using the stun belt was Applicant's lengthy prior criminal history.

165. Applicant had a prior conviction for the offense of aggravated assault on a peace officer.

166. Applicant had a prior conviction for the offense of robbery by threats.

167. Applicant also had prior felony convictions for felon in possession of a firearm (2), possession of a controlled substance, and burglary of a building.

168. Applicant also had several convictions for resisting arrest.

169. Applicant also had several convictions for evading arrest.

170. Applicant had previously been charged with escape.

171. At the time of the instant trial, Applicant was serving a forty-five year sentence for evading arrest or detention in a vehicle.

172. In the instant case, Applicant was charged with a violent offense, attempted murder, and with being a habitual criminal. Applicant was facing an aggravated life sentence.

173. During pretrial hearings, the trial court was made aware that Applicant had driven at least two different cars into two different lakes in attempts to escape from police.

174. During pretrial hearings, the trial court was made aware that Applicant had in the past displayed an aggressive demeanor while in custody.

175. During pretrial hearings, the trial court was made aware that Applicant was suspected of the murder of Billy Hanks.

176. During pretrial hearings, the trial court was made aware that the motive for the alleged attempted murder in the instant case was retaliation for Everett Angle's naming of Applicant as a suspect in the Billy Hanks murder.

177. The trial court was made aware at the pretrial hearings that Everett Angle would be testifying as a witness in the instant trial.

178. At the time of Applicant's instant trial he still had several felony cases pending in which he was charged as a habitual criminal.

179. During pretrial hearings there had been a level of animosity between the prosecutors and Applicant.

180. During pretrial hearings, Applicant had represented that he was a trained boxer.

181. During pretrial hearings, Applicant represented himself to be around 6'2" tall and weighing around 280 pounds.

182. From appearance throughout the pretrial hearings and trial, Applicant was in excellent physical condition.

183.     Applicant presents no credible evidence that the use of the stun belt denied him due process.

184.     Applicant presents no credible evidence to support his claim that he was unable to represent himself because he was wearing a stun belt.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, at 799-802 (citations to the record omitted).

Based on its findings, the state habeas court determined that Calton was properly advised of the disadvantages in representing himself, that restraints were authorized in trials where the defendant posed a threat to himself or others, that the use of a stun belt is reasonable where a *pro se* defendant presents a security risk in the courtroom, and that Calton had failed to prove that the use of a stun belt in his case was improper or denied him his right to represent himself. *Id*. at 813 (citations omitted). To the contrary, there existed adequate justification for the restraints and the restraints were at all times invisible to the jury during the guilt/innocence phase of Calton's trial. *See Deck, v. Missouri*, 544 U.S. 622, 631-32 (2005).

### 8.  *Ineffective Assistance of Counsel and Denial of Access to the Courts*

Calton claims he was denied effective assistance of counsel during the 30-day period for filing a motion for new trial and on appeal and denied access to the courts. (Petition at 48-64) On May 20, 2004, the day following completion of his trial, Calton filed a pro se notice of appeal and "Motion For Free Reporter's Record And Affidavit Of Inability To Pay For Counsel And Reporter's Record." (Clerk's R. at 1196-97) On the same date, Barry Alford was appointed to represent Calton on appeal. (*Id.* at 1198) Calton claims counsel failed to familiarize himself with Calton's trial, to confer with Calton regarding what issues and errors occurred during trial before filing a frivolous motion for new trial and to raise one or more of his claims on appeal. (Petition at 48-57) Calton

further claims that he was denied access to the courts because he was unable to timely file and present to the trial court his own pro se motion for new trial, which had been confiscated by TDCJ officials. (Petition at 57-64)

The state habeas court entered the following relevant findings of fact regarding the issue based largely on counsel's affidavit:

108.    Hon. Barry Alford represented Applicant during the appellate proceedings.

109.    Hon. Alford has been a licensed attorney in good standing with the State Bar of Texas since May, 1992 and has primarily practiced criminal law.

110.    Hon. Alford was appointed to represent Applicant on May 21, 2004, the same day Applicant was transferred from Tarrant County Jail.

111.    Hon. Alford wrote Applicant a letter informing Applicant that he had been appointed to represent him as soon as he learned where Applicant was transferred.

112.    Hon. Alford advised Applicant that if he had any questions or comments regarding his appeal, Applicant could write him.

113.    Hon. Alford timely filed a motion for new trial.

114.    Hon. Alford received the reporter's and clerk's records from the appellate clerk.

115.    Hon. Alford spent numerous hours reading the records, conducting legal research, and planning the points of errors he wanted to raise.

116.    Applicant presents no credible evidence that *he made* Hon. Alford aware of the issues that Applicant wanted to raise in his motion for new trial in time to raise it in a motion for new trial.

117.    Applicant presents no credible evidence that he contacted Hon. Alford in time for Hon. Alford to raise specific issues in his motion for new trial.

118.    Applicant presents no credible evidence that he contacted the trial court advising the trial court to contact his appellate attorney to raise specific issues in a motion for new trial.

119.    Applicant never advised Hon. Alford that he wanted to raise any issues on a motion for new trial at any time during his appeal.

120.    Applicant did not contact Hon. Alford until just before he filed the brief in this case.

121.    Applicant informed Hon. Alford that he wanted certain transcripts that were not included in the reporter's record.

122.    Hon. Alford contacted the court reporter, Mr. Steve Schiller, regarding the alleged missing records.

123.    Mr. Steve Schiller advised Hon. Alford that the hearings Applicant was concerned about were on different cases and not this one.

124.    Applicant never advised Hon. Alford that he wanted to raise several issues on appeal, including ineffective assistance of counsel, a *Brady* claim, and a claim for newly discovered evidence.

125.    Hon. Alford believes that Applicant's ineffective assistance claim was frivolous because Applicant represented himself.

126.    Applicant never objected to the points of error raised in the brief.

127.    After Hon. Alford filed a petition for discretionary review on Applicant's behalf, [but] Applicant moved for the petition to be dismissed.

.        .        .

185.    The trial on the merits in the instant case concluded on May 20, 2004.

186.    On May 20, 2004, Applicant told the trial court that he wished to have counsel appointed for appeal rather than represent himself.

187.    On May 20, 2004, Applicant executed a "Motion For Free Reporter's Record And Affidavit Of Inability To Pay For Counsel And Reporter's Record" in which he stated that he was without counsel for appeal and unable to pay for appellate counsel or the record for appeal.

189.    Applicant was appointed counsel to represent him on appeal on May 21, 2004.

190.    Hon. Alford filed a motion for new trial for Applicant on June 3, 2004.

191. Applicant presents no credible evidence that he requested to proceed on appeal *pro se*.

192. Applicant presents no credible evidence that he advised the court that he wanted to file a motion for new trial *pro se*.

*Ex parte Calton*, State Habeas Application No. WR-65,590-07, vol. 4, at 796-97, 802-03 (citations to record omitted).

Based on its findings, the state habeas court, applying the familiar *Strickland* standard, determined that Calton had failed to prove that counsel did not attempt to contact him timely, that he made counsel aware of the issues he wanted to raise in his motion for new trial, that had counsel presented different claims in his motion for new trial and/or on appeal the motion/appeal would have been granted, or that counsel's representation constituted deficient performance. *Id.* at 809-10 & vol. 3, at 521; *Strickland v. Washington*, 466 U.S. 668 *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Under Texas law, there is support that the time period for filing a motion for new trial is considered a critical stage of the proceedings during which a defendant is constitutionally entitled to assistance of counsel. *See Hanson v. State*, 11 S.W.3d 285, 288 (Tex. App.–Houston [14th Dist.] 1999, pet. ref'd). There is, however, a rebuttable presumption that a defendant was represented by counsel and counsel acted effectively. *See Oldham v. State,* 977 S.W.2d 354, 363 (Tex. Crim. App. 1998). Calton asserts that following his conviction, counsel, who was unfamiliar with his trial and had no access to the record, filed a frivolous motion for new trial without conferring with him. According to Calton, counsel should have has raised three additional points–his *Brady* claim, his newly discovered evidence claim, and his due process claim (i.e., forced to wear a stun belt during trial). Calton, however, has not brought forth a meritorious claim in either instance. Counsel is not required to file frivolous motions or raise a meritless claim. *See Sones v. Hargett*, 61 F.3d 410, 415

n.5 (5ᵗʰ Cir. 1995); *United States v. Gibson*, 55 F.3d 173, 179 (5ᵗʰ Cir. 1995).  Calton has not established that he was not represented by counsel during the time for filing a motion for new trial.

Similarly, appellate counsel is not required to raise every conceivable argument urged by his client on appeal, regardless of merit.  *Smith v. Robbins*, 528 U.S. 259, 287-88 (2000) (applying *Strickland* standard to ineffective assistance claims against appellate counsel).  It is counsel's duty to choose among potential issues, according to his judgment as to their merits and the tactical approach taken.  *Jones v. Barnes*, 463 U.S. 745, 749 (1983).  A petitioner must show that appellate counsel's failure to raise an issue worked to his prejudice–i.e., that but for counsel's errors he would have prevailed on his appeal.[1]  *Sharp v. Puckett*, 930 F.2d 450, 453 (5ᵗʰ Cir. 1991).  Calton has not satisfied this requirement.  Calton has identified no potentially meritorious points of error that his appellate counsel could or should have included as a part of his appellate brief.  Thus, it follows, that counsel was not ineffective for failing to raise the issues on appeal.  Nor does prejudice result from appellate counsel's failure to assert a meritless claim or a meritless argument.  *See United States v. Wilkes*, 20 F.3d 651, 653 (5ᵗʰ Cir. 1994).

Finally, Calton was not denied access to the courts.  Although Calton asserts that he wanted to proceed pro se in filing a motion for new trial and sought to file a pro se motion for new trial that he had laboriously prepared, he requested counsel be appointed to represent him following completion of his trial.  Assuming, without deciding, that Calton had a Sixth Amendment right to counsel during the 30-day period following his trial, it is well-established that a criminal defendant has no constitutional right to hybrid representation, "partly by counsel and partly by himself." *Neal*

---

[1]The performance component of *Strickland* need not be addressed first, and an ineffective assistance claim may be disposed of on the ground of lack of sufficient prejudice.  *Robbins*, 528 U.S. at 286 n.14; *Strickland*, 466 U.S. at 697.

*v. Texas*, 870 F.2d 312, 315-16 (5th Cir. 1989) (citing *United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978)); *see also McKaskle v. Wiggins,* 465 U.S. 168, 183 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation...."); *Myers v. Johnson,* 76 F.3d 1330, 1335 (5th Cir. 1996) (observing that "there is no constitutional right to hybrid representation"). Although Calton requested and received permission to proceed pro se during trial in compliance with *Faretta,* he sought representation by counsel thereafter. Thus, he had no right to file motions and pleadings with the court on his own behalf. Because Calton had no constitutional right to hybrid representation, his contention that he has been denied access to courts is without merit.

### 9. *Cumulative Error*

Calton claims the cumulative effect of the alleged errors he raises herein so infected the entire trial that his conviction violates his constitutional rights. (Petition at 87-89) The state habeas court found that Calton had presented no authority that the accumulation of his alleged errors is cognizable as an individual claim and concluded that Calton had failed to prove that the accumulation of his alleged errors presented a different claim for relief than the alleged errors. *Ex parte Calton*, State Habeas Application No. WR-65,590-07, vol. 4, at 794, 808. The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness. *See Jackson v. Johnson,* 194 F.3d 641, 655 n.59 (5th Cir. 1999). Apparently, the state habeas court rejected Calton's claim because none of his alleged errors rose to the level of a violation of state or federal law. In order to merit federal habeas relief, the individual errors must involve matters of constitutional dimension rather than mere violations of state law. *See Derden v. McNeel*, 978 F.2d 1453. 1454 (5th Cir. 1992). Because Calton's claims either fail to implicate a constitutional violation or are

meritless, he presents nothing to cumulate.  Moreover, Calton's trial was not rendered fundamentally unfair by virtue of any of the matters about which he complains in this Court.

### 10.  Evidentiary Hearing

Calton contends that he was not afforded a full and fair adjudication of his claims in state court because the state court did not hold a live evidentiary hearing on the merits of the claims.  The Texas Court of Criminal Appeals denied Calton's state habeas application without written order.  As previously noted, this ruling constitutes an adjudication of his claims on the merits and is entitled to the presumption of correctness.  *See Bledsue v. Johnson*, 188 F.3d 250, 257 (5th Cir.1999); *May v. Collins*, 955 F.2d 299, 311 (5th Cir. 1992); *Ex parte Torres*, 943 S.W.2d at 472.  Moreover, if a petitioner fails to develop a factual basis for a claim in state court, a federal habeas court shall not conduct an evidentiary hearing on the claim unless the claim relies on a new rule of constitutional law or on "a factual predicate that could not have been previously discovered through the exercise of due diligence," and the facts "would be sufficient to establish by clear and convincing evidence" the petitioner's actual innocence.  28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 434-37 (2000).  Calton has not met this burden.  Thus, an evidentiary hearing is not warranted.

### 11.  Conclusion

Calton's claims (10) and (12) are voluntarily waived.  As to the remainder of his claims, Calton has failed to demonstrate that the state courts' determination of the claims is contrary to or involves an unreasonable application of federal law or appears based on an unreasonable determination of the facts in light of the record as a whole.  Thus, the state courts' adjudication of the claims is entitled to deference and the presumption of correctness.

## II.  RECOMMENDATION

Calton's petition for writ of habeas corpus should be DENIED.

## III.  NOTICE OF RIGHT TO OBJECT TO PROPOSED
## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within ten (10) days after the party has been served with a copy of this document.  The court is extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until October 7, 2008.  The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made.  *See* 28 U.S.C. § 636(B)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual finding or legal conclusion accepted by the United States District Judge.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc op. on reh'g); *Carter v. Collins*, 918 F.2d 1198, 1203 (5th Cir. 1990).

## IV.  ORDER

Under 28 U.S.C. § 636, it is ORDERED that each party is granted until October 7, 2008, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, a response shall be filed within seven (7) days of the filing

date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED September 16, 2008.


____/s/   Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE